ST. JOE MINERALS CORPORATION,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

No. 72–1543.

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 1974.

Decided Jan. 29, 1975.

David McNeil Olds, John McN. Cramer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

Wallace H. Johnson, Asst. Atty Gen., Edmund B. Clark, Martin Green, John E. Varnum, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before ALDISERT, ADAMS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The pivotal issue in this appeal is whether the Administrator of the Environmental Protection Agency is vested with the authority to disapprove a state implementation plan, or one of its provisions, drafted pursuant to the Clean Air Act Amendments of 1970, when the Administrator has found such plan to be "technologically infeasible."

### I.

Under the Clean Air Act Amendments of 1970, the Administrator of the Environmental Protection Agency is directed to promulgate national primary[1] and secondary[2] ambient air quality standards for each air pollutant designated by the Administrator as having an adverse effect upon the public health or welfare.[3]

The states are each required to develop an air pollution control scheme by which the national ambient air quality standards may be achieved within each state. The implementation plan of each state must then be submitted for the approval of the Administrator.[4]

Upon approval by the Administrator, the implementation plan developed by each state may be enforced by the Administrator, as well as the state. Under federal law, fines and sentences of imprisonment may be imposed on those who refuse to comply with the plan.[5] In addition, violators are subject to enforcement suits by private individuals.[6]

St. Joe Minerals Corporation operates a zinc-smelting plant at Monaca, Pennsylvania. These facilities emit sulfur oxides, which are the subject of ambient air quality standards established by the Administrator.

During December, 1971, the Commonwealth of Pennsylvania held four days of hearings focused on controlling sulfur oxide pollutants. The Commonwealth then submitted its implementation plan to the Administrator in January, 1972. The regulations published by the Administrator to assist the states in formulating their implementation plans included "Examples of Emission-Limitations Attainable with Reasonably Available Technology."[7] One of the examples was a standard for zinc smelters, such as that operated by St. Joe. The Pennsylvania implementation plan, however, which contained only one standard governing all existing sources of sulfur oxide emissions within the state, concededly was substantially more stringent, when applied to a smelter, than the Administrator's example.[8] Without conducting further hearings the Administrator in May, 1972, approved Pennsylvania's plan in part and disapproved it in part.[9]

1. Primary ambient air quality standards are those necessary, in the Administrator's judgment, to protect national health. 42 U.S.C. § 1857c–4 (Supp.1974).

2. Secondary ambient air quality standards are those necessary, in the Administrator's judgment, to preserve the general welfare. 42 U.S.C. § 1857c–4 (Supp.1974).

3. 42 U.S.C. §§ 1857c–3, 1857c–4 (Supp.1974). The Administrator is to include in the list of pollutants all substances for which air quality criteria had previously been established and any others which, in the Administrator's opinion, (1) detracted from the public health or welfare; (2) originated from numerous sources; and (3) merited controls.

4. 42 U.S.C. § 1857c–4 (Supp.1974). For a more complete description of the procedure, see Duquesne Light Co. v. E.P.A., 481 F.2d 1 (3d Cir. 1973); Buckeye Power, Inc. v. EPA, 481 F.2d 162 (6th Cir. 1973).

5. 42 U.S.C. § 1857c–8 (Supp.1974).

6. 42 U.S.C. § 1857h–2 (Supp.1974).

7. 40 C.F.P. part 51.

8. According to St. Joe, the Administrator's standard would have required St. Joe to recapture approximately 94% of the potential sulfur oxide emissions. The Pennsylvania plan requires recapture of approximately 97%.

9. 37 Fed.Reg. 10842, 10889–91.

St. Joe filed with this Court a petition challenging the Administrator's approval of that portion of the Pennsylvania implementation plan relating to sulfur oxide emissions.[10] St. Joe alleged that the Administrator had not fulfilled certain procedural requirements, and asked that the case be remanded to the EPA. On January 22, 1973, this Court granted the motion for a remand without specifying the type of procedure to be followed by the EPA on the remand. The EPA moved for clarification of the order or for a rehearing. On the motion for clarification, after consideration of the record of the state proceedings, this Court stated that it was not convinced that St. Joe had been afforded "a truly meaningful hearing" regarding the technological and economic feasibility of the Pennsylvania implementation plan. Moreover, the Court indicated that events since the state proceedings may have rendered the plan outdated. The EPA, therefore, was ordered either to grant St. Joe a limited hearing on the technological and economic feasibility of the plan or to suspend enforcement of the plan against St. Joe while the company pursued "with due diligence" state administrative and judicial remedies for its infeasibility claims.[11]

Pursuant to this Court's ruling, the EPA elected to conduct an administrative hearing on the feasibility of the plan. After considering written and oral presentations by St. Joe, the Commonwealth and the EPA staff, the Administrator, in a decision announced March 18, 1974, concluded that the Pennsylvania provisions relating to sulfur oxide emissions "as applied to St. Joe Minerals Corporation's smelter . . . [are] technologically infeasible." He therefore did not reach the question of economic feasibility. The Administrator, however, interpreted the Clean Air Act Amendments "as precluding any disapproval of the plan on that basis." He proposed instead to notify the Commonwealth of his finding of technological infeasibility and to request a revision. Furthermore, he proposed to stay federal enforcement of the plan pending state administrative and judicial review of the plan.

St. Joe petitioned this Court to review the Administrator's refusal to disapprove the plan, alleging that the Administrator's refusal was based on an erroneous construction of the law.[12]

## II.

St. Joe contends that where the state has not provided an adequate hearing on the issues of the technological and economic feasibility of an emission limitation in a state implementation plan and the limitation has not been demonstrated to be essential to the achievement of a primary or secondary ambient air quality standard, the Administrator must disapprove the limitation when he has found it to be technologically or economically infeasible. The Administrator, on the other hand, argues that if the criteria set forth in section 110(a)(2)[13] are satisfied,

---

10. Similar petitions were filed by Duquesne Light Co., Pennsylvania Power Co. and Ohio Edison Co.

11. Duquesne Light Co. v. Environmental Protection Agency, 481 F.2d 1 (3d Cir. 1973). The implementation plan remained in effect as to all potential polluters except St. Joe, Duquesne Light, Pennsylvania Power and Ohio Edison.

12. 42 U.S.C. § 1857c–5 (Supp.1974) requires that the Administrator either "approve" or "disapprove" the plan within four months of submission.

13. 42 U.S.C. § 1857c–5(a)(2) (Supp.1974):

(2) The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

(A)(i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e) of this section) in no case

sections 110(a)(2) and 116[14] require him to approve a provision of an implementation plan even though he has found the provision to be technologically or economically infeasible and more restrictive than is necessary to attain national ambient air quality standards. According to the Administrator, to obtain a revision of the implementation plan so as to conform to that which is technologically and economically possible, St. Joe must resort to state administrative and judicial review. Furthermore, confining St. Joe to state review, the agency suggests, is not inappropriate since the Administrator has stayed federal enforcement of the provision in question.

later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;

(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls;

(C) it includes provision for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality and, (ii) upon request, make such data available to the Administrator;

(D) it includes a procedure, meeting the requirements of paragraph (4), for review (prior to construction or modification) of the location of new sources to which a standard of performance will apply;

(E) it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region;

(F) it provides (i) necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan, (ii) requirements for installation of equipment by

## III.

Although judicial review of the actions of administrative agencies is limited in scope, the Administrator's approval of the sulfur oxide provision of the Pennsylvania implementation plan cannot escape review by the Court of Appeals if the agency's decision is founded upon an incorrect conclusion of law.[15] Therefore, we must determine whether, under the circumstances here, sections 110 and 116 compel the Administrator to approve the provision of the Pennsylvania plan that he has found technologically infeasible.

There appears to be no opinion which squarely addresses the precise issue

owners or operators of stationary sources to monitor emissions from such sources, (iii) for periodic reports on the nature and amounts of such emissions; (iv) that such reports shall be correlated by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection; and (v) for authority comparable to that in section 1857h—1 of this title, and adequate contingency plans to implement such authority;

(G) it provides, to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards; and

(H) it provides for revision, after public hearings, of such plan (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements.

14. 42 U.S.C. § 1857d–1 (Supp.1974).

15. 5 U.S.C. §§ 701(a), 706 (1965); Delaware Citizens for Clean Air v. Admin., 480 F.2d 972, 975–976 (3d Cir. 1973); Pennsylvania v. E.P.A., 500 F.2d 246 (3d Cir. 1974). See United States v. Allan Drug Co., 357 F.2d 713 (10th Cir. 1966), cert. den. 385 U.S. 899, 87 S.Ct. 203, 17 L.Ed.2d 131 (1966); Kovac v. I.N.S., 407 F.2d 102 (9th Cir. 1969); Wheatley v. Adler, 132 U.S.App.D.C. 177, 407 F.2d 307 (1968).

raised on this appeal. However, an interpretation of the Clean Air Act Amendments empowering the Administrator to disapprove the Pennsylvania plan if he finds it technologically unworkable is implicit in our decision in *Duquesne Light.* If the Administrator has no authority to disapprove such plan or provision, there would have been no cause to remand the case to the EPA so as to conduct a hearing on precisely this subject. Indeed, the agency argued in *Duquesne Light,* in urging a denial of the remand, that the statute had not intended the Administrator to consider economic and technological factors. Yet we ordered the remand.

The Court's earlier decision in Getty Oil Co. v. Ruckelshaus [16] is premised upon a similar reading of the duty of the Administrator under sections 110 and 116. In *Getty Oil,* Getty operated an oil refinery in Delaware and supplied fluid petroleum coke, a by-product, to Delmarva Power and Light Co., which operated a nearby power station. Delmarva, in turn, supplied electricity and steam to the refinery. As part of its implementation plan, Delaware imposed a limit on the sulfur content of fuels burned in the area in which the Delmarva station was located. This portion of the implementation plan was approved by the EPA, and neither Getty nor Delmarva sought judicial review. However, Getty subsequently asked the state to grant the power station a variance so as to delay the effective date of the sulfur restriction. The relevant state administrative agencies denied the variance, but when Getty sought review in the Delaware courts, it obtained an order restraining the state from enforcing the sulfur limitation.

While the state was so restrained, however, the EPA ordered Delmarva to comply with the implementation plan EPA had already approved. Getty asked this Court to review the compliance order. That order, Getty alleged, deprived Getty of due process because national primary air quality standards had already been met in the area without compliance, and because compliance, prior to the development of alternative technology, would therefore impose an unreasonable economic burden on Getty and Delmarva. Significantly, this Court held that Getty at that time was barred from obtaining judicial consideration of its claims of technological and economic infeasibility since Getty could have obtained such review at the time EPA approved the implementation plan. Section 307(b),[17] the Court reasoned, bars subsequent scrutiny of any claim that could have been reviewed by a court of appeals at the time of the Administrator's approval of the plan.

An essential underpinning of this Court's decision in *Getty Oil* was the conclusion that the Court could have considered technological and economic objections to the state implementation plan when the EPA approved it. If a court of appeals is empowered to review, and presumably reverse, the Administrator's approval on technological and economic grounds, then surely the Administrator has the authority to review the plan on those same grounds and disapprove the plan, or a portion of it, if he finds it unreasonable.

The Court of Appeals for the Fourth Circuit has reached a similar conclusion with respect to the function of the EPA when it considers implementation plans.

**16.** 467 F.2d 349 (3d Cir. 1972), cert. den. 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).

**17.** 42 U.S.C. § 1857h–5(b):

(b)(1) . . . A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c–5 of this title or section 1857c–6(d) of this title . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation, approval, or action, or after such date if such petition is based solely on grounds arising after such 30th day.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.

In Appalachian Power Co. v. E. P. A.[18] the Administrator argued that his task in reviewing implementation plans was largely ministerial and that he does not consider either the technological or the economic feasibility of the state plan before approving it. The court concluded, "We take no such narrow view . . . of the Administrator's role in evaluating the state plan in connection with his exercise of the power to approve or disapprove."[19]

The Sixth Circuit, like this one, has compelled the EPA to allow interested parties an opportunity to present to the EPA their claims that a proposed implementation plan is technologically or economically impracticable.[20] The Sixth Circuit, therefore, has also implied that the EPA has the power to reject a proffered plan on those bases.

Admittedly, the Act does not expressly empower the agency to disapprove a plan where restrictions are too narrow to be practicable. Certainly, however, Congress would have made its purpose more explicit if it had intended by section 110(a)(2) to limit the Administrator's authority so as to require him to effectuate an implementation plan even though compliance with such plan is technologically infeasible and the constraints in the plan have not been shown to be essential to the accomplishment of the national standards.

A review by the EPA of the feasibility of an implementation plan is not inconsistent with the statutory language. The Administrator is directed to determine whether an implementation plan provides for the attainment of primary ambient air quality standards "as expeditiously as *practicable*" and secondary standards within "a reasonable time."[21] These temporal qualifications suggest that in considering an implementation plan the Administrator should evaluate the workability of the proposed limitations.

■ Disapproval of an implementation plan for technological reasons is not, as the Administrator argues, barred by section 116.[22] Section 116 states:

Except as otherwise provided . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan . . . such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

The purport of section 116 is merely to permit the state, under state law, to enforce stricter pollution controls than those that are included in the EPA-approved implementation plan, while prohibiting the states from adopting any measures less restrictive than the applicable federal implementation plan. Section 116 does not prevent the Administrator from adopting in an implementation plan a restriction which is less se-

**18.** 477 F.2d 495 (4th Cir. 1973).

**19.** 477 F.2d at 505. Since the Fourth Circuit had not received the full record which had been before the Administrator it dismissed the motions to remand the matter to the agency, without prejudice to the parties' renewing them after the record had been certified to the Court. 477 F.2d at 507–508.

**20.** In Buckeye Power, Inc. v. E. P. A., 481 F.2d 162, 173 (1973), the Sixth Circuit held that the agency was required to conduct a rule-making proceeding in conformity with 5 U.S.C. § 553 to consider, inter alia, the petitioners' feasibility claims. However, unlike this Court in Getty, the Sixth Circuit concluded that the petitioners would be entitled to litigate those same claims again in an enforcement proceeding.

**21.** 42 U.S.C. § 1857c–5(a)(2)(A) (Supp.1974) (emphasis added)

**22.** 42 U.S.C. § 1857d–1 (Supp.1974).

vere than that which the state chooses to enforce under state law.[23]

Also, the procedures for evaluating an implementation plan prior to the Administrator's acceptance of it reflect the importance of technological and economic factors not specifically mentioned in section 110. The Administrator is given four months to review the plan proposed by the state.[24] During that period the plan is evaluated by a committee composed of representatives of other federal agencies such as the Federal Power Commission, the Department of Transportation, Labor, Commerce and the Interior, as well as the Office of Management and the Budget. According to the Administrator, this committee "review[s] the aggregate impact of all these implementation plans" and provides assistance "in determining the availability of fuels, transportation programs, and public and private sector investment."[25] As the Fourth Circuit has observed, "It is inconceivable that these agencies, acting with the Administrator, in determining 'the aggregate impact' of the plans and 'in determining the availability of fuels, transportation programs and public and private sector investment,' do not con-

sider and evaluate the technological and economic aspects of the plans under review."[26]

## IV.

■ The effect of the Administrator's approval is not, as the agency has claimed, nullified by the Administrator's statement that he will stay enforcement of the plan by the EPA pending reconsideration by the Commonwealth. The decision to stay is not binding on a successor to the present Administrator. Indeed such a stay would not be enforceable by St. Joe even against the present Administrator. Moreover, St. Joe is left vulnerable to private civil actions, authorized by the Act, that might be brought to enforce compliance by St. Joe with the approved implementation plan.[27] Thus, the approval of the plan by the EPA has concrete adverse consequences for St. Joe despite the Administrator's undertaking to stay enforcement until the Commonwealth has reconsidered its plan.

For the foregoing reasons, the approval by the Administrator will be vacated and the matter remanded to the Administrator for action consistent with this opinion.

---

23. The conference committee report on the 1970 Amendments to the Act states only that:
    Except with respect to standards for moving sources [of pollutants], the states' authority to adopt and enforce standards is applicable to air quality and emissions is retained in the conference substitute [bill]. Reprinted at 3 U.S.Code Cong. & Admin. News 5374 (91st Cong.2d Sess.1970).
    Moreover, section 116 is derived from section 109 of the Air Quality Act of 1967, P.L. 90–148, which provided:
    Nothing in this title shall prevent a state . . . from adopting standards and plans to implement an air quality program

which will achieve a higher level of ambient air quality than approved by the Secretary.

24. 42 U.S.C. § 1857c–5(a)(2) (Supp.1974).

25. See Hearings, Senate Subcomm. on Air and Water Pollution, Comm. on Public Works, 92d Cong., 2d Sess. (1972), at 230, 236, 256.

26. Appalachian Power Co. v. EPA, 477 F.2d 495, 506 (4th Cir. 1973).

27. 42 U.S.C. § 1857h–2 (Supp.1974).