**DELAWARE CITIZENS FOR CLEAN AIR, INC., a Delaware corporation, Petitioner,**

v.

**ADMINISTRATOR U. S. ENVIRONMENTAL PROTECTION AGENCY and William D. Ruckelshaus.**

No. 72–1548.

United States Court of Appeals, Third Circuit.

Argued March 8, 1973.

Decided June 21, 1973.

Jacob Kreshtool, Bader, Dorsey & Kreshtool, Wilmington, Del., for petitioner.

Kent Frizzell, Asst. Atty. Gen., and Edmund B. Clark, Martin Green and James R. Walpole, Dept. of Justice, Land and Natural Resources Division, Washington, D. C., for respondents.

Before FORMAN, VAN DUSEN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Pursuant to § 307(b)(1) of the Clean Air Act, 42 U.S.C. § 1857h–5(b)(1) (1970),[1] Delaware Citizens for Clean Air, Inc. (DCCA) here challenges the Environmental Protection Agency's (EPA) approval of portions of Delaware's implementation plan. The challenge is on the merits. We stress this point because all the decided cases we have been able to locate either deal with strictly procedural attacks or dispose of substantive attacks on procedural grounds. See Duquesne Light Co. v. EPA, 481 F.2d 1, Nos. 72–1542 and 72–1543 (3d Cir., 1973); Utah International, Inc. v. EPA, 478 F.2d 126 (10th Cir., 1973); Appalachian Power Co. v. EPA, 477 F.2d 495 Nos. 72–1733, 72–1734, 72–1776 (4th Cir., 1973); Getty Oil Co. v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972). Because of the unfamiliar and complex technical issues involved, we have approached this case with great "diffidence" and judicial restraint, see International Harvester Co. v. Ruckelshaus, (D.C.Cir., 1973).[2]

---

1. § 1857h–5(b)(1) provides:
   " . . . A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c–5 . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval. . . . "
   This statute does not set down any standard for review of the EPA's action.

2. Unfortunately, the court's deliberations were not greatly aided by the sparse briefs submitted by both DCCA and the EPA. Discussion of the scope of judicial review was most abbreviated, references to the long and technical record were rare, and no mention was made of the various significant changes made in the Delaware plan subsequent to May 31, 1972.

The legislative plan of the Clean Air Act was extensively set out by Judge Adams in Duquesne Light Co. v. EPA, *supra,* at 2–4 of 481 F.2d, and so it is unnecessary to discuss it in detail here.[3] Delaware, like all states, was required to submit to the EPA an implementation plan which would meet a variety of federal standards regarding the regulation of air pollution. Delaware held a federally mandated public hearing on November 29, 1971, and submitted its plan on January 28, 1972. On May 31, 1972, the EPA approved some parts of the plan and disapproved others. 37 Fed.Reg. 10842, 10856–57 (1972). DCCA filed its petition for review in June 1972. DCCA challenges EPA's approval of those sections of the Delaware plan dealing with the control of sulfur dioxide and nitrogen dioxide.

The EPA's authority to prescribe regulations for sulfur dioxide and nitrogen dioxide is based on Clean Air Act § 109, 42 U.S.C. § 1857c–4 (1970). The statute orders the EPA to promulgate what it calls national primary and secondary ambient air quality standards for substances which have been determined to be air pollutants. Primary standards are based on the protection of the public health; the secondary standards are based on the protection of the public welfare, which includes factors beyond merely the physical health of the populace. The primary and secondary standards promulgated by the EPA for sulfur

dioxide appear, respectively, in 40 C.F.R. § 50.4 and § 50.5 (1972). The standard for nitrogen dioxide, which is both primary and secondary, is in 40 C.F.R. § 50.11 (1972). The EPA has also promulgated guidelines for the control strategies that should appear in state implementation plans where the ambient levels of a pollutant exceed the applicable standard. See 40 C.F.R. § 51.13 (1972) (sulfur dioxide) and § 51.14 (1972) (nitrogen dioxide).

The thrust of DCCA's petition is that the Delaware plan does not (1) meet the statutory deadline for attaining the nitrogen dioxide standard and (2) contain various measures, asserted to be made compulsory by the statute, for attaining the nitrogen dioxide standard and for maintaining it and the primary and secondary sulfur dioxide standards. Before dealing with DCCA's arguments more specifically, however, we will describe certain developments that make much of this case moot.

Delaware's plan itself seems to indicate that it is inadequate to attain the nitrogen dioxide standard.[4] Nevertheless, when EPA on May 31, 1972, approved the nitrogen dioxide control strategy it proposed an attainment date of May 31, 1975,[5] for the Metropolitan Philadelphia Interstate Air Quality Control Region.[6] The EPA also proposed the same date for the attainment of the primary and secondary sulfur dioxide standards.[7]

---

3. For additional description, see Appalachian Power Co. v. EPA, *supra*; Note, Clean Air Act Amendments of 1970; A Congressional Cosmetic, 61 Geo.L.J. 153 (1972).

4. "The 14 percent reduction achieved does not provide the 17 percent reduction needed." R. 437. It is noted in the plan that both the need for, or the potential success of, the Delaware control strategy are very hard to estimate because the strategy is based on very limited data. R. 438–39.

5. *See* 37 Fed.Reg. 10857 (1972). In the release accompanying the approval, the EPA stated that, if necessary, it would promulgate attainment dates meeting the

requirements of the Clean Air Act, see 37 Fed.Reg. 10843 (1972), and this is apparently what it did here. The factual basis for this proposed date is not at all clear, but, given the subsequent developments noted in the text, it is necessary for this court to consider the propriety of the proposed date.

6. The portion of this region in Delaware consists of New Castle County. The rest of Delaware is included in the Southern Delaware Intrastate Air Quality Control Region, whose air is apparently much cleaner and which is consequently not directly involved in the current litigation.

7. 37 Fed.Reg. 10857 (1972).

Whatever the dates were as of May 31, 1972, they were changed after the filing of the petition in this matter by the publication on July 27, 1972, of new attainment dates.[8] This new schedule, whose "dates reflect the information presented in the Delaware Plan," [9] gives January 1972 for the primary sulfur dioxide standard; January 1973 for the secondary sulfur dioxide standard; and January 1974 for the nitrogen dioxide standard. Quite recently, on May 23, 1973, the EPA published approval of a revision to the plan, changing the attainment date for the secondary sulfur dioxide standard from January 1973 to January 1974.[10] This revision was based on information submitted by Delaware following notice and a public hearing.

Meanwhile, because of litigation not directly related to the present case,[11] the EPA has withdrawn approval from the maintenance provisions of all state implementation plans.[12] Also, it has proposed a substantial relaxation of the secondary sulfur dioxide standard.[13]

The net effect of these developments appears [14] to make moot a number of issues in this case. The challenge to the approval of Delaware's control strategy for attaining the primary sulfur dioxide standard is moot because Delaware has evidently already (January 1972) attained this standard. It is not possible to evaluate the correctness of the strategy for attaining the secondary sulfur dioxide standard, for the information upon the basis of which the attainment date was changed to January 1974 is not now before the court.[15] The maintenance provisions for both the primary and secondary sulfur dioxide standards and the single nitrogen dioxide standard are no longer approved (see note 12 above). The only remaining question raised by the petition is whether the approval of Delaware's strategy for attaining the nitrogen dioxide standard was proper.[16]

Clean Air Act § 307(b)(1), 42 U.S.C. § 1857h–5(b(1) (1970), is silent on the scope or standard of our review of the EPA's action. The Administrative Procedure Act, 5 U.S.C. § 701(a) (1970), dictates that the scope of review set out in 5 U.S.C. § 706 (1970) is applicable. *See* Citizens To Preserve Overton Park,

8.  37 Fed.Reg. 15082 (1972).

9.  *Id,* which includes, *inter alia,* this language:
    "§ 52.420 Identification of plan.

    \*    \*    \*    \*    \*

    "(c) Supplemental information was submitted on February 11, March 10, May 5, June 2, and June 5, 1972, by the State of Delaware, Department of Natural Resources and Environmental Control.

    .    .    .    .    .

    "§ 52.428 Attainment dates for national standards.
    "The following table presents the latest dates by which the national standards are to be attained. These dates reflect the information presented in the Delaware plan. . . ."

10.  38 Fed.Reg. 13561–62 (1973).

11.  Natural Resources Defense Council, Inc. v. EPA, 475 F.2d 968 (D.C.Cir. 1973).

12.  38 Fed.Reg. 12920 (1973).

13.  38 Fed.Reg. 11355 (1973).

14.  As mentioned above, *supra* note 2, the parties have not commented upon any of the revisions of the attainment dates of the Delaware plan. Fortunately, these revisions seem to speak for themselves.

15.  Presumably DCCA can appeal the EPA approval of this revision.

16.  To the best of our knowledge, all information relating to the January 1974 attainment date for the nitrogen dioxide standard is in the record before us.
    Since the Delaware plan as it now stands will attain the nitrogen dioxide standard, it is unnecessary for this court to consider any possible significance in the difference between 40 C.F.R. § 50.11 (1972), which sets the standard at "100 micrograms per cubic meter (0.05 ppm)—annual arithmetic mean," and 40 C.F.R. § 51.14(c)(3) (1972), which requires of implementation plans only that they "shall provide for the degree of nitrogen oxides emission reduction attainable through the application of reasonably available control technology."

Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Yet the impact of § 706 is not entirely clear.

■ Section 706(2)(E) mandates that a reviewing court hold unlawful agency action "unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute. . . ." This is not a case subject to sections 556 and 557, see Duquesne Light Co. v. EPA, Nos. 72–1542 & 72–1543, 481 F.2d 1 (3d Cir., 1973); Appalachian Power Co. v. EPA, Nos. 72–1733, 72–1734 & 72–1776, 477 F.2d 495 (4th Cir., 1973). Nor does the Clean Air Act, as construed in Duquesne Light Co. and Appalachian Power Co., provide for a hearing by the EPA. Rather, the statute affords interested parties a hearing at the state level before the state adopts an implementation plan. Clean Air Act § 110(a)(1), 42 U.S.C. § 1857c–5(a)(1) (1970). While the EPA has a duty to consider the record developed at the state hearing, see Appalachian Power Co. v. EPA, supra, it is by no means clear what else the EPA can also consider in evaluating a plan. Given the time lag between the state hearing and the EPA decision, the fast rate of change in the state of the art of pollution measurement and control, and the determination of the EPA to keep current, it appears inevitable that the EPA will go beyond the record of the state hearing.[17] Furthermore, all the items from which the EPA has accumulated experience and expertise are not explicitly reproduced in the papers presented to this court. Consequently, the application of a "substantial evidence" test is quite difficult. Cf. Citizens To Preserve Overton Park, Inc. v. Volpe, supra, at 414–415, 91 S.Ct. 814.

■ Perhaps for this reason the court in Appalachian Power Co., supra, suggested that the proper scope of review is that outlined by the Supreme Court in Citizens To Preserve Overton Park, Inc. v. Volpe, supra at 415–416, 91 S.Ct. 814. In Overton Park the Supreme Court addressed itself to 5 U.S.C. § 706(2)(A) (1970), which requires reversal of an agency decision found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The Court said,

"To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citing authorities.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 823.

After reviewing the record certified to us by the EPA, which included the record of the state hearing in November 1971, we have concluded that as to all of the above aspects of review, the DCCA has not overcome, insofar as the strategy for attaining the nitrogen dioxide standard is concerned, the "presumption of regularity" to which an agency decision is entitled, see 401 U.S. at 415, 91 S.Ct. 814.

The statute relevant here is Clean Air Act § 110(a)(2)(A), (B), 42 U.S.C. § 1857c–5(a)(2)(A), (B) (1970). The EPA should approve a plan after determining, in part, if "in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but . . . in no case later than three years from the date of approval of such plan" and if "it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary . . . standard, including, but

---

17. We note that in the case before us the parties do not raise any due process questions, at least not any such questions which arose out of the EPA's approval of the nitrogen dioxide control strategy.

not limited to, land-use and transportation controls." In the context of the post-May 31, 1972, events, DCCA's petition may be read as arguing that meeting the nitrogen dioxide standard by January 1974 is not as expeditious as practicable and that the Delaware plan should include land-use and transportation controls.

The record of the November 1971 Delaware hearing contains scant reference to the control of nitrogen dioxide. Of the three representatives of DCCA to speak at the hearing, see R. 1388–94, 1466–68, 1468–78, only one discussed the Delaware regulation [18] dealing with nitrogen dioxide at all, and then did not question the stringency of the regulation. R. 1477. The DCCA submission, Exhibit # 11, treated the matter similarly. R. 1550, 1556. The only other mention of the regulation was made by a representative of Getty Oil, who questioned whether control of stationary sources was needed, given the expectation that automobile emissions would be sharply reduced. R. 1458–59.

The EPA's explanation of its approval of this portion of the Delaware plan is set forth in the Implementation Plan Evaluation Report for the State of Delaware, R. 935, 941–42:

"The nitrogen dioxide control strategy in the plan was based on 1970 air quality data. The emission inventory data are representative of the year 1969, and hence either 1969 air quality data should be used in the rollback calculations or 1970 emission inventory data should be used. The State has adopted stationary source emission limitations that reflect reasonably available control technology. This along with the credit taken for the effects of the Federal Motor Vehicle Control Program meets the requirements of 40 CFR 51.14(c) and therefore the nitrogen dioxide control strategy is recommended for approval."

Also relevant is the letter of June 2, 1972, in which Delaware informed the EPA of the attainment dates eventually published on July 7, 1972. In this letter it was stated, "With respect to nitrogen dioxide, Delaware expects to attain the national (primary-secondary) standard by January 1, 1974, with the help of expected motor vehicle emission controls and New Jersey $NO_2$ regulations equivalent in emission stringency to Delaware's." R. 728. We consider this letter to be part of the Delaware plan approved by the EPA.

Against these items must be weighed the indication in the Delaware plan itself, R. 433–39, that the control strategy for nitrogen dioxide might not be adequate to attain the standard at all.[19] This indication must, however, be regarded as modified by the June 2, 1972, letter, which was based, at least in part, on additional information—the New Jersey implementation plan. The technical nature of the above-mentioned documents increases the difficulty of evaluating them. However, it is clear from them that the EPA has considered the following factors: the technology now available to deal with emissions from stationary sources; the levels of emissions from automobiles to be expected in the future; the current level of pollution of Delaware air; and the impact of the implementation plan of New Jersey. Plaintiffs have not pointed out, and we do not perceive, any other relevant factors which the EPA has ignored. Furthermore, it does not appear that, in deciding between the costs of and the need for installing pollution control equipment, the EPA has made a clear error of judgment. Consequently, under the scope of review discussed above, this court must hold that the EPA action was proper.[20]

18. This regulation was at the time numbered XXII. See R. 1458. It was renumbered and appears in the present Delaware plan as XII. See R. 551.

19. See note 4, supra.

20. Also, as noted above at 976, the EPA action is entitled to "a presumption of regularity," 401 U.S. at 415, 91 S.Ct. 814.

Similarly, we are unable to hold that the Delaware plan failed to carry out the statutory mandate regarding land-use and transportation controls. The statute requires the use of such "measures as may be necessary to insure attainment" of the nitrogen dioxide standard, and in Delaware the standard is apparently going to be attained without them.[21]

For the foregoing reasons, the Petition for Review will be denied (1), on the merits, insofar as it challenges the decision of the EPA to approve the Delaware control strategy for the attainment of the nitrogen dioxide ambient air quality standard, and (2), as moot, in all other respects. Each party will bear its own costs.

---

21. We note that the statute would require land-use and transportation controls if they were necessary to insure maintenance of the standard. We, of course, pass no judgment upon whether such controls are required in the Delaware plan. It is arguable that land-use and transportation controls are mandated by the statute both for attainment and for maintenance. The agency charged with administration of the statute, however, apparently construes it as not mandating land-use and transportation controls for attainment if other measures will suffice. In this instance we defer to the expertise of the agency.